**UNITED STATES of America,**
**Plaintiff–Appellee**

v.

**Ronald LATEVOLA, Defendant–**
**Appellant.**

No. 00–4252.

United States Court of Appeals,
Sixth Circuit.

Aug. 8, 2002.

874

Before MOORE and SILER, Circuit Judges; STAFFORD, District Judge.*

STAFFORD, District Judge.

Appellant, Ronald Latevola ("Latevola"), appeals his sentence. We affirm.

I.

On June 14, 2000, Latevola pleaded guilty to four counts of defrauding his employer, the Menorah Federal Credit

---

* The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

Union ("Menorah"), in violation of 18 U.S.C. § 1344. The United States Probation Office recommended that Latevola be sentenced at an adjusted offense level of 23 with a criminal history category I. The resulting recommended guideline range of imprisonment was 37 to 46 months.

Starting with a base offense level of 6, the Probation Office recommended (1) an increase of 9 levels pursuant to U.S.S.G. § 2F1.1(b)(1)(J) because the loss exceeded $350,000; (2) an increase of 2 levels pursuant to U.S.S.G. § 2F1.1(b)(2) because the offense involved more than minimal planning; (3) an increase to level 24 pursuant to U.S.S.G. § 2F1.1(b)(7)(A) because the offense substantially jeopardized the safety and soundness of a financial institution; and (4) a decrease of 3 levels pursuant to U.S.S.G. § 3E1.1(b) based on Latevola's acceptance of responsibility. Latevola objected to the 9-level enhancement for causing a loss in excess of $350,000 and to the enhancement to level 24 for substantially jeopardizing the safety and soundness of a financial institution.[1] Latevola also requested a downward departure, pursuant to U.S.S.G. § 5K2.16, for having voluntarily disclosed his criminal conduct to the authorities.

The United States presented three witnesses at the sentencing hearing held on September 8, 2000: Robert Weltman ("Weltman"), Banita Taylor ("Taylor"), and Carmelo D'Agostino ("D'Agostino").

Weltman testified that, over a span of approximately twenty-five years starting in or about 1966, he had served as Menorah's treasurer, director, director emeritus, and president. After he turned the presidency over to Allen Goodman ("Goodman") in 1992 or 1993, Weltman—an attorney—continued to serve Menorah in a consulting legal capacity.

In 1998, Weltman was advised by Goodman that Latevola, Menorah's manager since sometime in 1993, had embezzled a large amount of money from Menorah. Weltman testified that Latevola's actions not only resulted in losses to Menorah well in excess of $350,000 but they also left Menorah in a "very bleak" financial condition. J.A. at 38.

After spending at least portions of approximately two years inspecting Latevola's fictitious loans, family-related loans, and bad faith loans, Weltman assisted in presenting Menorah's bond claim to the bonding company. The bonding company ultimately settled the claim for $457,000, an amount which—according to Weltman—covered only a portion of the credit union's total losses. Weltman explained that had the bonding company not come through with the settlement monies when it did, Menorah would have been forced to close its doors. Even with the settlement monies, Menorah was thereafter given the weakest possible rating by the governing body for federal credit unions.

D'Agostino, a federal credit union examiner, testified that he was in the process of examining Menorah when Latevola's embezzlement was discovered. He said that, during the course of his examination, he at first became concerned about a number of checks made out to "Barbara Zacharyacz" that were cashed at a check cashing service by Latevola's wife. When D'Agostino asked Latevola about the checks, he was told that Latevola's wife knew the woman and was "just trying to help her out." J.A. at 61. When D'Agostino discovered still more questionable checks made out to "Barbara Zacharyacz" involving disbursements from the accounts of other members, he again asked Latevola for an expla-

---

1. Effective November 1, 2001, after Latevola was sentenced, the provisions of U.S.S.G. § 2F1.1 were merged into the provisions of § 2B1.1.

nation. Latevola replied that the woman was good friends with other members of the credit union as well.

Latevola's puzzling explanations led D'Agostino to a review of Menorah's membership cards. Discovering a few cards that appeared to be questionable, D'Agostino decided to investigate by visiting the homes of two applicant members. When he found that one of the two members lived in a low income high-rise, the other in a home that was "not in real good condition," both in the lower west side of the city, D'Agostino questioned Latevola about how these people became members of Menorah. Latevola indicated that there were other organizations that could join Memorah and that these people belonged to those other organizations. At this point, having also discovered questionable checks that Latevola said were payments made by his wife on a loan, D'Agostino called his supervisor and explained that he was feeling very uncomfortable about the situation. D'Agostino then asked Latevola if he had anything more to tell him. Latevola soon after called Goodman and arranged to meet with him. At that meeting, Latevola apparently confessed to having embezzled from the credit union.

When asked what impact Latevola's embezzlement had on Menorah, D'Agostino testified that it hurt the credit union "significantly." When asked whether, as a result of Latevola's actions, Menorah was placed in jeopardy of becoming insolvent, D'Agostino answered: "Yes." He explained that, if the losses had been entered on the books, the credit union was in fact insolvent "during the period of time from the embezzlement until probably all the way up until the bonding company actually paid off." J.A. at 68. D'Agostino added that even after the bonding company made payment, Menorah's position remained very weak, albeit solvent.

Banita Taylor took over Latevola's duties as manager of Menorah after Latevola's embezzlement was discovered. Taylor testified that the amount Latevola claimed he embezzled—$227,000—was not accurate, that the actual figure was well in excess of $350,000. She said:

[W]e were closer to half a million dollars, and we are still incurring additional losses by having to take these loans off the books, because all along we were borrowing money to meet the fictitious loan demand.

So not only did we pay other credit unions and tak[e] money from our depositors to meet what we thought—what they thought was the outstanding loan demand, in addition to that, these loans now have to be written off our books, and so we are not getting anything on these either.

J.A. at 86.

When asked whether, as a result of Latevola's embezzlements, the credit union was placed in jeopardy of becoming insolvent, Taylor answered: "It was." J.A. at 87. She said that if the bonding company had not come through with payment by August 2, 2000, "it was over." J.A. at 87. She also said that Menorah was forced to reduce and/or eliminate some important benefits to its members in order to cut costs, that board members and employees had to spend long hours over a long period of time in an effort to straighten out the embezzlement-related "mess" caused by Latevola, and that—as a result of the time-consuming focus on the credit union's very existence—Menorah's employees were not "available to our members for the last two years as they should have been." J.A. at 88.

When asked about Latevola's confession, Taylor explained that his confession covered only part of the actual embezzlement. She said that there was a tremendous

amount to which he did not confess, that she uncovered transfers and such on a daily basis that were not included in Latevola's confession.

While testifying in his own behalf, Latevola stated that he submitted a written confession to Goodman before D'Agostino uncovered any of his wrongdoing. He explained that he confessed because it "just basically got to me." J.A. at 117. On cross-examination, Latevola was asked if he remembered being questioned by D'Agostino about questionable checks and loan payments made on behalf of his wife. When Latevola basically said that he did not remember, the district court took over the questioning. In full, the ensuing colloquy between the court and Latevola was as follows:

THE COURT: Do you recall answering questions that Mr. D'Agostino made to you, posed to you?

DEFENDANT: Yes.

THE COURT: Did you give truthful answers when he asked you those questions, or did you lie?

DEFENDANT: I must have given truthful answers. I don't recall what the questions were at that time.

THE COURT: You were here this morning. You have heard Mr. D'Agostino's account of the conversation. And you know clearly according to him you lied to him. So I am asking you do you remember?

DEFENDANT: I don't remember. It was two and a half years.

THE COURT: You don't remember whether you told the truth or lied?

DEFENDANT: A lot has transpired in two years.

THE COURT: You're under oath now.

DEFENDANT: Right.

THE COURT: Are you telling me you don't remember whether you told the truth to Mr. D'Agostino or not; is that what you're saying now?

DEFENDANT: Being a federal examiner, and having questions asked of me, I would have to answer truthfully.

THE COURT: You're telling me, under oath, you answered Mr. D'Agostino truthfully in April of '98?

DEFENDANT: To the best of my ability, I don't remember specifically what was asked of me and what I answered, being that time period had transpired.

THE COURT: Do you remember him asking you about checks to Barbara Zacharyacz, or something like that?

DEFENDANT: Yes, I do.

THE COURT: Did you tell him that your wife knew her and she was trying to help her out?

DEFENDANT: Which is true, yes.

THE COURT: And that's the reason those checks were written?

DEFENDANT: Yes, sir.

THE COURT: And what about checks to Barbara Zacharyacz charged to other accounts, did you tell Mr. D'Agostino that Barbara Zacharyacz was friends with these members and that's why she's writing checks to them?

DEFENDANT: In many cases other checks, other fictitious accounts.

THE COURT: So you lied to Mr. D'Agostino, that these people, these fictitious—

DEFENDANT: On that basis, yes.

THE COURT: So a moment ago I asked you did you tell the truth and you said you did, you weren't telling the truth?

DEFENDANT: I am trying to recall the best I can.

J.A. at 124–126.

At the conclusion of the sentencing hearing, the district court announced its find-

ings: namely, (1) that the government proved that Latevola caused a loss in excess of $350,000 as required for an enhancement under U.S.S.G. § 2F1.1(b)(1)(J); (2) that the government proved that Latevola's conduct substantially jeopardized Menorah's safety and soundness as required for an enhancement under U.S.S.G. § 2F1.1(b)(7)(A); (3) that Latevola did *not* prove that he voluntarily disclosed to authorities the existence of the offense prior to the discovery of such offense and, more particularly, that the offense was unlikely to have been otherwise discovered as required for a downward departure under U.S.S.G. § 5K2.16; and (4) that Latevola gave false testimony under oath during the sentencing hearing, which supported a two level increase under U.S.S.G. § 3C1.1. Based on his findings, the judge sentenced Latevola to a term of imprisonment of 57 months.

## II.

This court reviews a challenge to a trial court's legal conclusions regarding the sentencing guidelines *de novo*. A district court's factual findings in relation to the application of the Sentencing Guidelines are subject to a deferential "clearly erroneous" standard of review. *See* 18 U.S.C. § 3742(e); *United States v. Garner*, 940 F.2d 172, 174 (6th Cir.1991).

## III.

On appeal, Latevola challenges the district court's decision to enhance Latevola's sentence for substantially jeopardizing the safety and soundness of a financial institution, its decision to enhance for obstruction of justice, and its calculation of the amount of the loss to Menorah. We find no merit to any of Latevola's arguments.

### A. *Substantially Jeopardizing the Safety and Soundness of a Financial Institution*

■ At the time Latevola was sentenced, section 2F1.1(b)(7)(A) required an enhancement to level 24 where "the offense...substantially jeopardized the safety and soundness of a financial institution." The Comments to section 2F1.1 provided that an offense substantially jeopardized the safety and soundness of a financial institution if, as a consequence of the offense, the institution became insolvent, or substantially reduced benefits to its pensioners or insureds, or was unable on demand to refund fully any deposit, payment, or investment, or was so depleted of its assets as to be forced to merge with another institution in order to continue active operations, or was placed in substantial jeopardy of any of those consequences. U.S.S.G. § 2F1.1 Comment 17 (1998).

Here, there was ample evidence that Menorah was placed in substantial jeopardy of becoming insolvent, of having to merge, of being unable on demand to make payments, and of having to reduce benefits to members. All three of the government's witnesses testified to that effect. The district court was accordingly correct in applying the enhancement under section 2F1.1(b)(7)(A), which means that an unadjusted offense level of 24 was appropriate.

### B. *Enhancement for Obstruction of Justice*

■ Although Latevola did not object to the obstruction enhancement at the time of sentencing, Latevola argues that the district court's *sua sponte* imposition of a two level increase for obstruction of justice was plain error because the allegedly perjured testimony was not "material" to the sentencing issues before the trial court. In order to establish "plain error," a defendant must demonstrate (1) that error oc-

curred; (2) that the error was obvious or clear; (3) that the error affected substantial rights of the defendant; and (4) that the negative impact affected the fairness, integrity, or public reputation of the judicial proceedings. *See, e.g., United States v. Koeberlein,* 161 F.3d 946, 949 (6th Cir. 1998).

Pursuant to the provisions of U.S.S.G. § 3C1.1, a defendant's offense level should be increased two levels if he:

> willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and ... the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense ....

Obstruction of justice includes the act of "providing materially false information to a judge or magistrate." U.S.S.G. § 3C1.1 application note 4(f) (1998). "Material" information is information that, if believed, would tend to influence or affect the issue under determination. *United States v. Crousore,* 1 F.3d 382, 385 (6th Cir.1993) (citing U.S.S.G. § 3C1.1 Commentary). Notably, a district court has considerable discretion in determining whether the obstruction enhancement applies. *United States v. Moss,* 9 F.3d 543, 553 (6th Cir. 1993).

In this case, Latevola asked the court to give him the benefit of a downward departure under U.S.S.G. § 5K2.16 based upon his alleged voluntary disclosure of his offenses to authorities. Section 5K2.16 provides:

> If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a departure below the

applicable guideline range for that offense may be warranted.... This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent.

Clearly, whether and to what extent Latevola voluntarily disclosed truthful information to federal bank examiners about his activities was material to the departure issue under section 5K2.16. On cross-examination, Latevola was asked about the answers he gave to D'Agostino's questions after D'Agostino became suspicious of wrong-doing. When he was evasive in responding to counsel's questions, the district court jumped in and asked Latevola very pointedly whether he had given truthful answers during the bank examiner's investigation. In response to the judge's questions, Latevola was untruthful at worst, evasive at best; and while he ultimately admitted to having lied to the judge, his initial responses were—without question—indicative of an attempt to mislead the court into thinking he had been truthful to D'Agostino. Given such an attempt to "obstruct or impede the administration of justice during the course of the...sentencing" hearing, we find no abuse of discretion, much less plain error, in the district court's decision to enhance the sentence under section 3C1.1.

### 3. *Amount of the Loss*

■ Latevola contends that the district court's calculation as to the amount of the loss was "hopelessly corrupt" because it included amounts not specified in the indictment and because it allegedly included interest and loans made to third parties which the credit union might ultimately recover. He suggests that the loss attributable to him totaled only $208,000, an amount that should have triggered an 8–

level rather than a 9–level enhancement under U.S.S.G. § 2F1.1. We do not agree.

To be sure, none of the witnesses gave particularly illuminating testimony regarding the amount of the loss. Indeed, it is impossible to glean from this record a precise estimate of the overall loss. There was nonetheless convincing testimony from all three of the government's witnesses that the net losses were well in excess of $350,000 and were probably in excess of $500,000. The judge did not specify a precise figure but simply concluded that $350,000 was a very conservative figure given the testimony that he heard. He also said that he could not fathom why, after many months of investigating the circumstances, the bonding company would settle a claim for $450,000 if the loss were, in fact, "only 200 something thousand." J.A. at 130. While Latevola challenged the government's evidence, he presented no credible evidence to demonstrate that the credit union's figures were grossly inaccurate.

Furthermore, even if we were to agree with Latevola's estimate of the loss, he would not be entitled to sentencing relief because we have determined that the district court correctly increased his offense level to 24 under section 2F1.1(b)(7).

### III.

Having found no merit to Latevola's arguments on appeal, we AFFIRM.